NO. 22-15103, 22-15104

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

JOHN DOE #1 AND JOHN DOE #2,

PLAINTIFFS– APPELLEES,

V.

TWITTER, INC.,

DEFENDANT– APPELLANT.

On Appeal from the United States District Court
for the Northern District of California
The Honorable Joseph C. Spero
District Court Case No. 21-cv-000485

**BRIEF OF AMICI CURIAE AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF NORTHERN CALIFORNIA, AMERICAN CIVIL LIBERTIES UNION OF SOUTHERN CALIFORNIA, CENTER FOR DEMOCRACY & TECHNOLOGY, CENTER FOR LGBTQ ECONOMIC ADVANCEMENT & RESEARCH, FREEDOM UNITED, FREE SPEECH COALITION, POSITIVE WOMEN'S NETWORK-USA, REFRAME HEALTH AND JUSTICE, SEX WORKERS OUTREACH PROJECT LOS ANGELES, AND THE SEX WORKERS PROJECT OF THE URBAN JUSTICE CENTER IN SUPPORT OF DEFENDANT–APPELLANT**

Jennifer Stisa Granick
*Counsel of Record*
AMERICAN CIVIL
  LIBERTIES UNION
  FOUNDATION
39 Drumm Street
San Francisco, CA 94111
(415) 343-0758
jgranick@aclu.org

Vera Eidelman
Laura Moraff
Joshua Block
AMERICAN CIVIL
  LIBERTIES UNION
  FOUNDATION
125 Broad Street
New York, NY 10004

Samir Jain
Emma Llansó*
Caitlin Vogus
CENTER FOR
  DEMOCRACY &
  TECHNOLOGY
1401 K St. NW, Suite 200
Washington, DC 20005
*Of counsel

*(Additional Counsel for Amici Curiae listed on following page)*

Jacob A. Snow
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION OF NORTHERN
  CALIFORNIA
39 Drumm Street
San Francisco, CA 94111

Minouche Kandel
Zoe McKinney
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION OF SOUTHERN
  CALIFORNIA
1313 W. 8th Street
Los Angeles, CA  90017

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29(a)(4)(A) of the Federal Rules of Appellate Procedure, amici curiae state that they do not have a parent corporation and that no publicly held corporation owns 10% or more of their stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS ................................................................................... ii

TABLE OF AUTHORITIES ............................................................................. iv

STATEMENT OF INTEREST .......................................................................... 1

SOURCE OF AUTHORITY TO FILE ............................................................... 5

FED. R. APP. P. 29(a)(4)(E) STATEMENT ................................................... 5

INTRODUCTION & SUMMARY OF ARGUMENT ......................................... 6

ARGUMENT ................................................................................................. 9

I.  Serious First Amendment questions would arise if the Court construed
    FOSTA to allow civil liability based merely on constructive knowledge ....... 9

II. Given the realities of how intermediaries moderate content, an actual
    knowledge standard is critical to ensuring that online expression remains
    free and robust ...................................................................................... 14

    A.  Congress enacted Section 230 to foster freedom of expression online,
        informed by how intermediaries moderate content ............................... 15

    B.  FOSTA has already harmed online speech and online communities ...... 17

    C.  Expanding civil liability under FOSTA to reach less than knowing
        conduct would only exacerbate these problems .................................... 20

        1.  The district court's interpretation of FOSTA creates a
            strong incentive for online intermediaries to over-remove user-
            generated content ...................................................................... 21

        2.  The district court's interpretation of FOSTA creates a perverse
            incentive for online intermediaries to deliberately ignore the content
            posted on their services ............................................................. 27

CONCLUSION ............................................................................................. 28

CERTIFICATE OF SERVICE FOR ELECTRONIC FILING ................................ 30

CERTIFICATE OF COMPLIANCE ........................................................................ 31

## TABLE OF AUTHORITIES

**CASES**

*Backpage.com LLC v. McKenna*,
   881 F. Supp. 2d 1262 (W.D. Wash. 2012) ......................................... 27

*Backpage.com, LLC v. Lynch*,
   216 F. Supp. 3d 96 (D.D.C. 2016) .................................................... 17

*Barnes v. Yahoo!, Inc.*,
   570 F.3d 1096 (9th Cir. 2009) .......................................................... 7

*Bd. of Educ. v. Pico*,
   457 U.S. 853 (1982) ....................................................................... 22

*Bond v. United States*,
   572 U.S. 844 (2014) ......................................................................... 9

*Carafano v. Metrosplash.com*,
   339 F.3d 1119 (9th Cir. 2003) ......................................................... 11

*Doe v. The Rocket Sci. Grp. LLC*,
   No. 1:19-cv-5393 (N.D. Ga. Nov. 26, 2019) ..................................... 26

*Erotic Serv. Provider Legal Educ. & Rsch. Proj. v. Gascon et al.*,
   881 F.3d 792 (9th Cir. 2018) ............................................................. 1

*Ginsberg v. New York*,
   390 U.S. 629 (1968) ....................................................................... 10

*J.B. v. G6 Hospitality, LLC*,
   No. 4:19-cv-7848, 2020 WL 4901196 (N.D. Cal. Aug 20, 2020)....................... 26

*Jones v. Dirty World Entm't. Recordings LLC*,
   755 F.3d 398 (6th Cir. 2014) ........................................................... 15

*Lamont v. Postmaster Gen. of U.S.*,
   381 U.S. 301 (1965) ....................................................................... 22

*Lewis v. Time Inc.*,
   83 F.R.D. 455 (E.D. Cal. 1979), *aff'd*, 710 F.2d 549 (9th Cir. 1983) ........... 11, 13

iv

*M.L. v. craigslist, Inc.*,
  No. 3:19-cv-6153, 2020 WL 6434845 (W.D. Wash. Apr. 17, 2020) .................. 26

*Manual Enters., Inc. v. Day*,
  370 U.S. 478 (1962) ..................................................................... 13, 14

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ........................................................................... 13

*NetChoice, LLC v. Att'y Gen. of Fla.*,
  No. 21-12355, 2022 WL 1613291 (11th Cir. May 23, 2022) .............................. 1

*Reno v. ACLU*,
  521 U.S. 844 (1997) ............................................................................. 1

*Ripplinger v. Collins*,
  868 F.2d 1043 (9th Cir. 1989) ......................................................... 10, 11

*Smith v. California*,
  361 U.S. 147 (1959) ....................................................................... 10, 14

*United States v. U.S. Dist. Ct. Cent. Dist. of Cal.*,
  858 F.2d 534 (9th Cir. 1988) ............................................................... 12

*United States v. X-Citement Video, Inc.*,
  513 U.S. 64 (1994) ........................................................................... 12

*Woodhull Freedom Foundation v. United States*,
  No. 18-1552 (D.D.C. 2022), *appeal docketed*, No. 22-5105 (D.C. Cir. Apr.
  28, 2022) ......................................................................................... 13

*Zeran v. AOL*,
  129 F.3d 327 (4th Cir. 1997) .........................................................7, 11, 15, 16

## BILLS & STATUTES

U.S. Code, Title 18

  18 U.S.C. § 1591 *et seq.* ............................................................... 7, 17

  18 U.S.C. § 1591(a) ....................................................................... 7, 17

18 U.S.C. § 1591(e)(4) ................................................................. 17

18 U.S.C. § 1595 ........................................................................... 7

18 U.S.C. § 2421A ........................................................................ 17

Section 230 of the Communications Decency Act

47 U.S.C. § 230 *et seq.* ......................................................... passim

47 U.S.C. § 230(c)(1) ..................................................................... 6

47 U.S.C. § 230(e)(5)(A) ........................................................... 7, 16

H.R. 6928, 117th Cong. (2022) ................................................... 18

S. 3758, 117th Cong. (2022) ....................................................... 18

S. Rep. No. 115-199 (2018) ......................................................... 16

**OTHER AUTHORITIES**

Abigail Moss, *'Such a Backwards Step': Instagram Is Now Censoring Sex Education Accounts*, Vice (Jan. 8, 2021) ............................................ 25

Amber Madison, *When Social-Media Companies Censor Sex Education*, Atlantic (Mar. 4, 2015) ................................................................. 25

Carey Shenkman, Dhanaraj Thakur & Emma Llansó, Cent. Dem. & Tech., *Do You See What I See*? (May 2021) ................................ 22

Danielle Blunt & Ariel Wolf, Hacking//Hustling, *Erased: The Impact of FOSTA-SESTA & the Removal of Backpage* (2020) ............................................................. 19, 20

EJ Dickson, *Why Did Instagram Confuse These Ads Featuring LGBTQ People for Escort Ads?*, Rolling Stone (July 11, 2019) ................................ 24

Gita Jackson, *Tumblr is Trying to Win Back the Queer Audience It Drove Off*, Vice (May 11, 2021) ...................................................................... 23

Helen Holmes, *"First They Come for Sex Workers, Then They Come for Everyone," Including Artists*, Observer (Jan. 27, 2021) ...................................... 18

Jake Ketchum & Laura LeMoon, *What Sex Workers Have to Say About HIV After FOSTA/SESTA*, TheBody (July 3, 2018) .................................... 20

Kendra Albert et al., *FOSTA in Legal Context*, 52.3 Columbia Human Rights L. Rev. 1084 (2021) ........................................... 18

Kendra Albert, *Five Reflections from Four Years of FOSTA/SESTA*, Cardozo Arts & Entm't L. J. (forthcoming) ....................................... 19

Lacey-Jade Christie, *Instagram Censored One of These Photos But Not the Other. We Must Ask Why*, Guardian (Oct. 19, 2020) .......................................... 23

Lifeway, *Help Students Understand Sexual Purity* .................................... 26

Madeleine Connors, *StripTok: Where the Workers Are V.I.P.s*, N.Y. Times (July 29, 2021) ............................................................................ 25

Mark Hay, *How AI Lets Bigots and Trolls Flourish While Censoring LGBTQ+ Voices*, Mic (Mar. 21, 2021) ............................................... 24

Melanie Ehrenkranz, *British Cops Want to Use AI to Spot Porn—But It Keeps Mistaking Desert Pics for Nudes*, Gizmodo (Dec. 18, 2017) ............................ 23

Nafia Chowdhury, Stanford Freeman Spogli Inst. Int'l Studies, *Automated Content Moderation: A Primer* (Mar. 19, 2022) ........................ 22, 24

Natasha Duarte & Emma Llansó, Cent. Dem. & Tech., *Mixed Messages? The Limits of Automated Social Media Content Analysis* (Nov. 28, 2017) ... 22, 23

Nitasha Tiku, *Craigslist Shuts Personal Ads for Fear of New Internet Law*, WIRED (Mar. 23, 2018) ...................................................... 19

Nosheen Iqbal, *Instagram 'Censorship' of Black Model's Photo Reignites Claims of Race Bias*, Guardian (Aug. 9, 2020) ............................................. 23

Planned Parenthood, *Teen Council* ........................................................ 26

Shannon Liao, *Tumblr Will Ban All Adult Content on December 17th*, Verge (Dec. 3, 2018) ...................................................... 18

Survivors Against SESTA, *Documenting Tech Actions* ............................................ 19

Susie Jolly et al., UNESCO, *A Review of the Evidence: Sexuality Education for Young People in Digital Spaces* (2020) ........................................ 25

U.S. Gov't Accountability Off., GAO-21-385, *SEX TRAFFICKING: Online Platforms and Federal Prosecutions* (2021). ...................................... 17

U.S. Gov't Accountability Off., *Highlights of GAO-21-385* (2021) ........................ 18

Zoe Kleinman, *Fury over Facebook 'Napalm Girl' Censorship*, BBC News (Sept. 9, 2016) ................................................................ 22

## STATEMENT OF INTEREST

Amicus curiae the **American Civil Liberties Union** (ACLU) is a nationwide, nonprofit, nonpartisan organization dedicated to defending the principles embodied in the Federal Constitution and our nation's civil rights laws. The **ACLU of Northern California** is the Northern California affiliate of the ACLU. The **ACLU of Southern California** is the Southern California affiliate of the ACLU. Since its founding in 1920, the ACLU has frequently appeared before the U.S. Supreme Court, this Court, and other federal courts in cases defending Americans' free speech and freedom of association, including their exercise of those rights online. *See e.g., Reno v. ACLU*, 521 U.S. 844 (1997) (counsel); *NetChoice, LLC v. Att'y Gen. of Fla.*, No. 21-12355, 2022 WL 1613291 (11th Cir. May 23, 2022) (amici). Through its LGBTQ & HIV Projects, the ACLU advocates on behalf of the equal rights of lesbian, gay, bisexual, and transgender people, and people living with HIV. The ACLU also works to support sex workers against laws that discriminatorily target trans sex workers and sex workers of color, and laws that increase harm to sex workers. *See e.g. Erotic Serv. Provider Legal Educ. & Rsch. Proj. v. Gascon et al.,* 881 F.3d 792 (9th Cir. 2018) (amici).

The **Center for Democracy & Technology** (CDT) is a non-profit public interest organization. For more than twenty-five years, CDT has represented the public's interest in an open, decentralized Internet and worked to ensure that the

constitutional and democratic values of free expression and privacy are protected in the digital age. CDT regularly advocates before legislatures, regulatory agencies, and courts in support of First Amendment rights on the Internet and other protections for online speech, including limits on intermediary liability for user-generated content.

**Center for LGBTQ Economic Advancement & Research** (CLEAR) is a 501(c)(4) non-profit organization. CLEAR's mission is to empower LGBTQ+ households, organizations, and communities with fair and equal access to LGBTQ-affirming financial education and services to meet under-served LGBTQ+ financial needs. CLEAR produces research and advocacy around LGBTQ+ consumer issues, including consumer data and privacy issues, promoting LGBTQ+ people's ability to freely and authentically express themselves online using digital platforms, and ensuring their freedom from unfair policies that disproportionately target and exclude content about and created by LGBTQ+ people and communities.

**Freedom United** is an international anti-trafficking organization that advocates for effective and rights-based approaches to preventing human trafficking and supporting victims and survivors. As an anti-trafficking organization, Freedom United advocates for full decriminalization of sex work in order to build resilience to trafficking. Decriminalization should extend to online

spaces as well.

**Free Speech Coalition** (FSC) is a non-profit trade and advocacy association defending the rights and freedoms of the adult industry and its workers. FSC fights for a world in which body sovereignty is recognized, sexual expression is destigmatized and sex work is decriminalized.

**Positive Women's Network-USA** (PWN-USA) is a national organization building power by and for women and people of trans experience living with HIV, with a focus on those communities most impacted by the epidemic. PWN-USA envisions a future in which our communities are no longer subject to over-policing, surveillance, and brutality from the criminal legal system; and where those with a history of interaction with the criminal legal system have full rights, dignity, and bodily autonomy. PWN-USA works to advance strategic collaboration between the HIV decriminalization movement and efforts to decriminalize sex work.

**Reframe Health and Justice** (RHJ) is a collective of advocates working at the intersection of harm reduction, criminal-legal reform and healing. RHJ has over 30 years of collective experience specifically focused on the health and safety of sex workers across the country as community organizers, advocates for policy change, service providers and experts offering training and technical assistance. As harm reductionists, RHJ works on developing and disseminating harm

reduction tools and information for people who trade sex to combat interpersonal violence, exploitation and trafficking and poor health outcomes.

**Sex Workers Outreach Project Los Angeles** (SWOPLA) is a peer-based sex worker support and mutual aid group, whose members and community saw firsthand how FOSTA/SESTA made it harder for people to stay safe and survive. In their capacity as sex workers and in their capacity as mutual aid and harm reduction organizers, SWOPLA has seen how essential it is to have access to both private & encrypted channels of communication and to uncensored public channels of communication. SWOPLA has also seen how expanded enforcement of prohibitions meant to 'indirectly' curb sex trafficking end up increasing violence against sex workers, trafficking victims, and other survivors of abuse alike, by directly empowering abuse at the hands of law enforcement and other third parties and by creating an environment where communication, support, and services are more difficult to safely access.

The **Sex Workers Project of the Urban Justice Center** (SWP) is a national organization that defends the human rights of sex workers by destigmatizing and decriminalizing people in the sex trades through free legal services, education, research, and policy advocacy. As one of the only US organizations meeting the needs of both sex workers and trafficking victims, SWP serves a marginalized community that few others reach.

4

## SOURCE OF AUTHORITY TO FILE

Counsel for Defendant-Appellant and Plaintiffs-Appellees consent to the filing of this brief. *See* Fed. R. App. P. 29(a)(2).

## FED. R. APP. P. 29(A)(4)(E) STATEMENT

Amici declare that:

1. no party's counsel authored the brief in whole or in part;

2. no party or party's counsel contributed money intended to fund preparing or submitting the brief; and

3. no person, other than amici, their members, or their counsel, contributed money intended to fund preparing or submitting the brief.

## INTRODUCTION & SUMMARY OF ARGUMENT

Online intermediaries—including platforms like Twitter—play an essential role in facilitating the speech of hundreds of millions of people. In part, they play the role that book, magazine, and video stores and distributors traditionally played in enabling public access to educational information, art, political speech, and more—only at an even more massive scale. Search engines like Google and DuckDuckGo direct people to content; social media sites like Facebook, LinkedIn, and Pinterest allow people to post their own content; and web-infrastructure services like Amazon Web Services and Cloudflare make it possible to access content online. A myriad of other intermediaries are also essential facilitators of online speech.

Recognizing the risks that imposing open-ended liability on such actors could pose to online communication, Congress passed Section 230 of the Communications Decency Act in 1996, 47 U.S.C. § 230 ("Section 230"). The law immunizes interactive computer service providers, including the kinds of intermediaries identified above, from most civil liability and state law criminal charges based on the speech of their users. As this Court and others have recognized, Section 230(c)(1) protects against liability for the "exercise of a publisher's traditional editorial functions—such as deciding whether to publish,

withdraw, postpone or alter content." *Zeran v. AOL*, 129 F.3d 327, 330 (4th Cir. 1997); *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009).

In 2018, Congress amended Section 230 through the Allow States and Victims to Fight Online Sex Trafficking Act/Stop Enabling Sex Traffickers Act ("FOSTA"). FOSTA expanded the existing criminal provisions codified in 18 U.S.C. § 1591(a) and created a new federal crime related to sex trafficking. Most relevant to this case, it also amended Section 230 to permit civil causes of action for participating in a sex trafficking venture under 18 U.S.C. § 1595—but only "if the conduct underlying the claim constitutes a violation of [18 U.S.C. § 1591]." 47 U.S.C. § 230(e)(5)(A). Although Section 1595 allows for liability where a participant "knew or should have known" the venture was illegal, Section 1591 requires knowing participation or, for offenses not related to advertising a person for sex trafficking, reckless disregard.

Thus, one of the issues in this case is what level of knowledge a service provider must have to lose immunity under Section 230(e)(5)(A) and thereby be subject to civil liability: constructive knowledge, as under Section 1595, or actual knowledge, as under Section 1591.[1] The court below held that intermediaries can

---

[1] Amici write only to address the constitutional implications of the district court's view that FOSTA removed Twitter's Section 230 immunity based on an allegation that the company had constructive knowledge of sex trafficking on its service.

be held civilly liable for participating in a sex trafficking venture without actual knowledge of sex trafficking occurring on their services.

This Court must reverse that ruling. If permitted to stand, it would raise serious First Amendment questions. Courts have historically recognized that the scienter requirement imposed on intermediaries, including booksellers and distributors, is a constitutional issue, given the unique role these entities play in facilitating speech. Imposing liability on them can have a severe, unconstitutional chilling effect that substantially diminishes the universe of materials available to the public.

The same is equally, if not more, true for online intermediaries, which act as funnels for billions of pieces of content every day. Given the scale of the speech they enable, imposing liability on online intermediaries on the basis of merely constructive knowledge would have disastrous consequences for users: Intermediaries would choose either to remove protected, societally beneficial content to avoid the threat of liability—thereby depleting the full scope of speech and information available to the public—or they would opt to remain willfully ignorant of content posted on their services to avoid having any possible awareness (and therefore arguably constructive knowledge) of illegal content appearing there—thereby foregoing content moderation on their sites.

To avoid those serious constitutional questions and dire practical effects, the Court should adopt Defendant-Appellant's interpretation of FOSTA and reverse the district court's partial denial of the motion to dismiss.

## ARGUMENT

### I. Serious First Amendment questions would arise if the Court construed FOSTA to allow civil liability based merely on constructive knowledge.

The principle of constitutional avoidance holds that courts should adopt a statutory construction that avoids "grave and doubtful constitutional questions." *Bond v. United States*, 572 U.S. 844, 869 (2014) (Scalia, J. concurring). Construing FOSTA to allow online intermediaries to face civil liability without any actual knowledge or awareness of sex trafficking occurring on their sites would raise serious First Amendment questions. This Court can and should avoid determining what scienter requirement is robust enough to avoid chilling speech and undermining First Amendment interests by holding that FOSTA does not impose liability on intermediaries based on constructive knowledge.

Though the Supreme Court has not squarely determined what level of scienter a plaintiff must show to hold a distributor liable for carrying obscenity or child pornography, it has made clear that the answer implicates the First Amendment. This is because the imposition of liability with too low a scienter requirement "tends to impose a severe limitation on the public's access to

9

constitutionally protected matter" by "stifl[ing] the flow of democratic expression and controversy at one of its chief sources." *Smith v. California*, 361 U.S. 147, 152–53 (1959); *see also Ginsberg v. New York*, 390 U.S. 629, 644 (1968) (declining to further define the level of scienter required by the First Amendment where a New York statute prohibiting the knowing sale of obscenity to minors had been construed by the state's highest court to reach "not innocent but calculated purveyance of filth"). As the Court has explained in the context of traditional distributors of third-party speech, "if [a] bookseller is criminally liable without knowledge of the contents . . . he will tend to restrict the books he sells to those he has inspected." *Smith*, 361 U.S. at 153. And "[i]f the contents of bookshops and periodical stands were restricted to material of which their proprietors had made an inspection, they might be depleted indeed." *Id.*

This Court has also recognized that imposition of liability on distributors with too low a scienter requirement has chilling effects. In *Ripplinger v. Collins*, the Court determined that, for distributor liability, a "jury [must] find that the defendant knew of the 'character or nature' of the material" and that "a 'suspicion' of one scene of nudity or sexual activity" is not enough. 868 F.2d 1043, 1055 (9th Cir. 1989). Much like the Supreme Court, this Court was motivated by its concern that imposing the latter standard "would require a bookseller to examine personally

10

any book he had reason to believe contained sexual conduct to determine if it was obscene." *Id.* at 1056.

Courts' observation that imposing liability on intermediaries has a severe chilling effect applies with even more force to interactive service providers such as Twitter. Historically, even when courts considered the universe of content available via a single magazine or bookstore, they recognized the fact that "the distributor normally carries a multitude of [content]," meaning that their "self-censorship carries potentially more pervasive consequences." *Lewis v. Time Inc.*, 83 F.R.D. 455, 465 (E.D. Cal. 1979), *aff'd*, 710 F.2d 549 (9th Cir. 1983). This is even truer online, where "[i]nteractive computer services have millions of users," making "[t]he amount of information communicated via [them] . . . staggering." *Carafano v. Metrosplash.com*, 339 F.3d 1119, 1123–24 (9th Cir. 2003) (quoting *Zeran*, 129 F.3d at 330–31).

As this Court recognized nearly two decades ago, "[i]t would be impossible for service providers to screen each of their millions of postings for possible problems. Faced with potential liability for each message . . . interactive computer service providers might choose to severely restrict the number and type of messages posted." *Id.* at 1124. That is why "[t]he specter of [] liability in an area of such prolific speech [has] an obvious chilling effect." *Id.* Since this Court issued that opinion, the amount of content posted online has increased exponentially, and

the ramifications of imposing liability on intermediaries are no longer hypothetical. *See* Section II.C.

At the same time, information intermediaries typically have little control over the content users post on their services—and that, too, contributes to the chilling effect that imposing liability without actual knowledge would have. This is one reason that the First Amendment distinguishes between creators of illegal materials and those who make them available. For example, "[t]hose who arrange for minors to appear in sexually explicit materials are in a far different position from those who merely handle the visual images after they are fixed on paper, celluloid or magnetic tape." *United States v. U.S. Dist. Ct. Cent. Dist. of Cal.,* 858 F.2d 534, 543, n.6 (9th Cir. 1988). "While it would undoubtedly chill the distribution of books and films if sellers were burdened with learning . . . the content of all of the materials they carry . . ., producers are in a position to know or learn" that information. *Id*.; *see also United States v. X-Citement Video, Inc*., 513 U.S. 64, 77 n.5 (1994) (explaining that a video store must have a higher scienter than a producer in order to be liable for distributing child pornography because of "the reality that producers are more conveniently able to ascertain" information about the content).[2]

---

[2] It is also worth noting that individuals and organizations engaging in constitutionally protected online speech are challenging FOSTA's constitutionality in the courts. For example, the plaintiffs in *Woodhull Freedom Foundation v.*

The fact that the liability at issue here is civil does not change the analysis. "What a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law," for "[t]he fear of damage awards . . . may be markedly more inhibiting than the fear of prosecution under a criminal statute." *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 277 (1964); *see also Lewis*, 83 F.R.D. at 464 ("It makes no difference that here we deal with civil liability").

Indeed, in *Manual Enterprises, Inc. v. Day*, the Supreme Court reversed a lower court's determination that the government could civilly bar distribution of magazines without, at a minimum, first establishing that the magazine publisher "knew that at least some of his advertisers were offering to sell obscene material." 370 U.S. 478, 492 (1962). In the opinion offering the narrowest grounds for the judgment, Justice Harlan, joined by Justice Stewart, explained that "a substantial constitutional question would arise were we to construe [the law] as not requiring proof of scienter in civil proceedings." *Id.*[3]

_____

*United States*, No. 18-1552 (D.D.C. 2022), *appeal docketed*, No. 22-5105 (D.C. Cir. Apr. 28, 2022), assert that Section 1591(e) violates the First Amendment and the Due Process clause by making "assisting, supporting, and facilitating" sex trafficking a violation of federal law without specifying what those acts entail.

[3] In a separate opinion, Justice Brennan, joined by Chief Justice Warren and Justice Douglas, concluded that the civil law did not authorize the Postmaster General to employ his own administrative process to close the mail to obscene publications. *Manual Enters., Inc.*, 370 U.S. at 519. Those justices, too, recognized the

While noting that the statute at issue in *Smith* was criminal, the justices concluded that its logic must also apply to a civil penalty, because the "heavy financial sacrifice" a civil judgment could entail would as effectively "'impose a severe limitation on the public's access to constitutionally protected matter,' as would a state obscenity statute[.]" *Id.* at 492–93 (quoting *Smith*, 361 U.S. at 153). Faced with potential civil liability, "a magazine publisher might refrain from accepting . . . materials, which might otherwise be entitled to constitutional protection," thus "depriv[ing] such materials . . . of a legitimate and recognized avenue of access to the public." *Id.* at 493. The same is true here: opening the door to civil suits on the basis of constructive knowledge would raise a serious First Amendment question, and it would severely chill online speech—two results that this Court can avoid by holding that the statute requires actual knowledge.

## II. Given the realities of how intermediaries moderate content, an actual knowledge standard is critical to ensuring that online expression remains free and robust.

The First Amendment implications of expanding liability under FOSTA are not hypothetical. Although courts have had limited opportunities to interpret the meaning of the amendment to Section 230 regarding civil liability, the other sections of FOSTA, which expanded criminal liability based on at least a knowing

---

"constitutional difficulty tha[t] inheres in" determining the scienter required by the First Amendment for a civil order. *Id.* at 498.

mens rea, have already had a significant and harmful effect on online speech—especially the free expression, association, and safety of sex workers and the very children FOSTA sought to protect. In light of how intermediaries monitor and moderate content in practice, opening the door to civil liability on the basis of merely constructive knowledge would only exacerbate those harms.

A.   Congress enacted Section 230 to foster freedom of expression online, informed by how intermediaries moderate content.

Section 230 was informed by Congress's understanding of how exposing intermediaries to liability for content posted by their users would influence their content moderation decisions and restrict user speech. Congress correctly recognized that potential liability for content generated by users would discourage intermediaries from hosting other's speech at all, or cause intermediaries to remove speech that others deem controversial or objectionable. *Zeran*, 129 F.3d at 331 ("Faced with potential liability for each message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted"); *Jones v. Dirty World Entm't. Recordings LLC*, 755 F.3d 398, 407 (6th Cir. 2014) (describing how Section 230 protects unpopular online speech against a "heckler's veto").

To avoid these chilling effects, Section 230 forbids "the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions," including the moderation of content. *Zeran*, 129 F.3d at 331.

Indeed, Congress specifically enacted Section 230 to remove legal disincentives to such content moderation. *See id.* (explaining that an "important purpose of [Section] 230 was to encourage service providers to self-regulate the dissemination of offensive material over their services"); *id.* at 333 (recognizing that both strict liability and notice-based liability "would deter service providers from regulating the dissemination of offensive material over their own services").

Nevertheless, Section 230 included several narrow exceptions to the immunity it provided, such as for violations of federal criminal law. In 2018, Congress added a further exception as part of FOSTA to address Congress' concern that some websites had avoided liability for knowingly engaging in sex trafficking. *See* S. Rep. No. 115-199, at 4 (2018) (explaining, in the committee report accompanying the Senate bill, that the purpose of FOSTA is to ensure that an interactive computer service "cannot avoid liability" if it is "knowingly assisting, supporting, or facilitating sex trafficking"). By targeting FOSTA's Section 230(e)(5)(A) revision at intermediaries that knowingly engage in sex trafficking, Congress purportedly attempted to create a limited exception to the immunity conferred by Section 230—one which would not undermine Section 230's overall purpose of protecting online freedom of expression.

16

B.    FOSTA has already harmed online speech and online communities.

In addition to the civil implications at issue here, FOSTA expanded the existing criminal provisions codified in 18 U.S.C. § 1591(a), which fell within Section 230's exception for federal criminal prosecutions even prior to the enactment of FOSTA. Congress expanded that section, which had previously applied only to constitutionally-unprotected speech—"advertisements concerning illegal sex trafficking," *Backpage.com, LLC v. Lynch*, 216 F. Supp. 3d 96, 106 (D.D.C. 2016)—to reach any "knowing[] assist[ance of], support [for], or facilitat[ion of]" a violation of Section 1591(a)(1). 18 U.S.C. § 1591(e)(4). FOSTA also amended Section 230 to allow state authorities to prosecute interactive communications services under state law if the underlying conduct would violate 18 U.S.C. § 1591. And it created a new federal crime, codified at 18 U.S.C. § 2421A, prohibiting the use or attempted use of any facility of interstate commerce to promote or facilitate the prostitution of another person.

A June 2021 report by the Government Accountability Office (GAO) showed that federal prosecutors had not used the additional criminal penalties established by FOSTA.[4] At that time—more than three years after the passage of

---

[4] U.S. Gov't Accountability Off., GAO-21-385, *SEX TRAFFICKING: Online Platforms and Federal Prosecutions* 25 (2021), https://bit.ly/3mUc1YV.

the law—the DOJ had prosecuted only one case using FOSTA.[5] At the same time, the GAO reported that "gathering tips and evidence to investigate and prosecute those who control or use online platforms has become more difficult due to the relocation of platforms overseas" and "platforms' use of complex payment systems."[6]

At the same time, FOSTA has incentivized intermediaries to remove lawful content about sex work, sex, and sexuality—and it has made sex work more dangerous and, as noted above, sex trafficking harder to track in the process.[7]

Social media platforms like Instagram and Tumblr have broadly censored lawful topics related to sex to avoid liability.[8] Other platforms—especially niche,

---

[5] *Id.*

[6] U.S. Gov't Accountability Off., *Highlights of GAO-21-385* (2021), https://bit.ly/3mUc1YV.

[7] *See* Kendra Albert et al., *FOSTA in Legal Context*, 52.3 Columbia Human Rights L. Rev. 1084, 1088–89 (2021). Recognizing the severity of these problems, members of Congress have introduced the SAFE SEX Workers Study Act to conduct a federal study on the actual impact of FOSTA on sex workers. *See* S. 3758, 117th Cong. (2022); H.R. 6928, 117th Cong. (2022).

[8] *See* Helen Holmes, *"First They Come for Sex Workers, Then They Come for Everyone," Including Artists*, Observer (Jan. 27, 2021), https://bit.ly/3xDqCOd (reporting that, in the wake of FOSTA, Instagram has removed accounts belonging to as well as posts by poets, writers, and artists discussing sex work); *see also* Shannon Liao, *Tumblr Will Ban All Adult Content on December 17th*, Verge (Dec. 3, 2018), https://bit.ly/2SmoC5A.

free, and queer websites—have gone offline entirely.[9]

This has pushed people in the sex trades, who work in legal, semi-legal, and criminalized industries, off of online platforms and into dangerous and potentially life-threatening scenarios. In 2020, Hacking//Hustling conducted a study of FOSTA's effects on sex workers. Researchers found that the law had increased "economic instability for 72.45% of the online participants . . . with 33.8% reporting an increase of violence from clients."[10] Perhaps this is not surprising given that many affordable ways to advertise have shut down following FOSTA.[11] This has made sex workers more vulnerable to labor exploitation, and also made labor trafficking in the sex industry less visible.[12]

FOSTA has also caused platforms to shut down harm reduction tools like "bad johns" lists[13] and "VerifyHim," a system that helped sex workers vet clients by providing them with references. Individuals and harm reduction organizations

---

[9] Kendra Albert, *Five Reflections from Four Years of FOSTA/SESTA* at 14, Cardozo Arts & Entm't L. J. (forthcoming), https://bit.ly/3MNuSiQ.

[10] Danielle Blunt & Ariel Wolf, Hacking//Hustling, *Erased: The Impact of FOSTA-SESTA & the Removal of Backpage* 18 (2020), https://bit.ly/3HeFaac.

[11] Survivors Against SESTA, *Documenting Tech Actions*, https://bit.ly/3NH57Sq.

[12] Blunt & Wolf, *supra* note 9, at 18.

[13] Nitasha Tiku, *Craigslist Shuts Personal Ads for Fear of New Internet Law*, WIRED (Mar. 23, 2018), https://bit.ly/3zzl88G.

also reported that FOSTA made them wary of sharing harm-reduction and safety tips or doing check-ins with fellow workers.[14] Some sex workers have had to return to outdoor work or to in-person client-seeking in bars and clubs, where screening is necessarily more rushed than it is online, and where workers are more vulnerable.[15] TheBody, an organization that publishes HIV-related information, news, support, and personal perspectives, reports that FOSTA has put sex workers at greater risk of HIV infection.[16]

C.   Expanding civil liability under FOSTA to reach less than knowing conduct would only exacerbate these problems.

The district court's interpretation of FOSTA will further encourage online intermediaries to engage in undesirable content moderation practices, and may thereby exacerbate harms imposed on sex workers, as well as healthcare workers and teens. As reflected by the experience detailed above, some intermediaries will respond by removing even more lawful content, including by using blunt automated tools to proactively detect potentially problematic content. Others may

---

[14] Blunt & Wolf, *supra* note 9, at 33.

[15] Jake Ketchum & Laura LeMoon, *What Sex Workers Have to Say About HIV After FOSTA/SESTA*, TheBody (July 3, 2018), https://bit.ly/3ttYI4N (sex workers describing being forced from the relative safety of Internet work to the streets, vastly increasing their vulnerability to arrest, police harassment, and violence).

[16] *Id.*

design their service to deliberately avoid learning facts that could be said to give them constructive knowledge about the content posted on their services, and may carry content they would prefer not to in order to avoid any liability risk, potentially resulting in a bad experience for their users and customers.

1.   *The district court's interpretation of FOSTA creates a strong incentive for online intermediaries to over-remove user-generated content.*

The district court denied Twitter's motion to dismiss in part based on Plaintiffs' allegations that Twitter "permits large amounts of human trafficking and commercial sexual exploitation material on its platform, despite having the ability to monitor it" and that Twitter has "constructive knowledge of its posting on the platform." Opinion at 43. If the mere presence of content depicting sex trafficking on their services could expose intermediaries to potential liability, they would likely respond by using aggressive or inexact means to proactively detect and remove allegedly problematic content.[17] And this will adversely impact the First Amendment interests of both users posting content, and also those who receive

---

[17] The district court also relied on Plaintiffs' allegation that Twitter reports less apparent child sexual abuse material to the National Center on Missing and Exploited Children (NCMEC) compared to other services. Opinion at 43. This aspect of the Court's holding may encourage intermediaries to send erroneous reports to NCMEC in order to increase their reporting numbers.

information from them. *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 307 (1965); *Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982) (plurality opinion).

The sheer volume and diversity of material posted by billions of Internet users makes it all but impossible for intermediaries to filter out all illegal or legally risky speech without simultaneously sweeping in, and restricting, a broad swath of lawful material.[18] In order to moderate content at scale, service providers often rely at least in part on automated content moderation tools.[19] But those tools increase the risk of over-removals of lawful content, in part because they tend to perpetuate real-world biases and are unable to understand context.[20] These limitations are

---

[18] *See, e.g.*, Zoe Kleinman, *Fury over Facebook 'Napalm Girl' Censorship*, BBC News (Sept. 9, 2016), https://bbc.in/2NkjVvf.

[19] In general, automated tools for content moderation—which often take the form of content filters—fall into two categories: (1) matching tools, which "recogniz[e] something as identical or sufficiently similar to something [the tool] has seen before" and (2) prediction, which "recogniz[es] the nature of something based on the [tool's] prior learning," to "predict the likelihood that a previously-unseen piece of content violates a policy.*" Carey Shenkman, Dhanaraj Thakur & Emma Llansó, Cent. Dem. & Tech., *Do You See What I See*? 12 (May 2021), https://bit.ly/3H9YmGm; Nafia Chowdhury, Stanford Freeman Spogli Inst. Int'l Studies, *Automated Content Moderation: A Primer* 2 (Mar. 19, 2022), https://bit.ly/3zD96Lo. The process of prediction is referred to as "classification." Chowdhury, *supra*, at 2.

[20] *See* Chowdhury, *supra* note 18, at 3; *see also* Shenkman et al., *supra* note 18, at 7, 29; Natasha Duarte & Emma Llansó, Cent. Dem. & Tech., *Mixed Messages? The Limits of Automated Social Media Content Analysis* 14–19 (Nov. 28, 2017), https://bit.ly/3MNvqoU.

inherent to the technology and will be extremely difficult if not impossible to overcome, even in the future.[21]

As a result, if the district court's reading of FOSTA is allowed to stand, online intermediaries will turn to automated content moderation tools, which will indiscriminately detect, wrongly label, and remove a range of content that has nothing to do with sex trafficking.[22] Even intermediaries that do not increase their reliance on automated moderation will likely direct their human moderators to remove content more aggressively.

And, much like the documented effects of the criminal provisions of FOSTA—which already have had an asymmetric impact on individuals depending on their sexual orientation,[23] race,[24] and body-type[25]—these effects will not be felt

---

[21] *See* Duarte & Llansó, *supra* note 19, at 21.

[22] *See, e.g.*, Melanie Ehrenkranz, *British Cops Want to Use AI to Spot Porn—But It Keeps Mistaking Desert Pics for Nudes*, Gizmodo (Dec. 18, 2017), https://bit.ly/3aVgHLd (explaining that an automated system used to scan images for nudity often detects desert landscapes as human skin tones and erroneously flags them as "an indecent image or pornography").

[23] *See* Gita Jackson, *Tumblr is Trying to Win Back the Queer Audience It Drove Off*, Vice (May 11, 2021), https://bit.ly/3tsFOeN.

[24] Nosheen Iqbal, *Instagram 'Censorship' of Black Model's Photo Reignites Claims of Race Bias*, Guardian (Aug. 9, 2020), https://bit.ly/3QeW7p7.

[25] Lacey-Jade Christie, *Instagram Censored One of These Photos But Not the Other. We Must Ask Why*, Guardian (Oct. 19, 2020), https://bit.ly/3NH6ssq.

equally. LGBTQ users are particularly likely to be censorship targets. For example, in 2019, Instagram banned six advertisements for the newsletter *Salty* which featured transgender and non-binary people of color, on the erroneous basis that the ads promoted escort services.[26] Another study showed that Perspective, an artificial intelligence tool created by Google to assign a "toxicity" score to online content, tended to rate tweets by drag queens as "on average more toxic than" those by white supremacists.[27] If intermediaries increase their reliance on automated filters intended to detect sexually explicit materials in order to minimize liability risk, or set low confidence levels[28] when using them, these types of erroneous removals of content by and about LGBTQ people will increase.

Over-censorship is also particularly likely for discussions of sex, sexual health, and sex work. This includes content intended to educate sex workers on

---

[26] EJ Dickson, *Why Did Instagram Confuse These Ads Featuring LGBTQ People for Escort Ads?*, *Rolling Stone* (July 11, 2019), https://bit.ly/3QiTgvI.

[27] Mark Hay, *How AI Lets Bigots and Trolls Flourish While Censoring LGBTQ+ Voices*, Mic (Mar. 21, 2021), https://bit.ly/3tuv3se.

[28] The output of predictive models of content moderation can be described using a confidence level, e.g., "a classifier could determine that it is 60% confident that a given image contains sexually explicit content." Chowdhury, *supra* note 18, at 5. Intermediaries will often set a threshold confidence level that must be met "before removing or taking other action on a piece of content." *Id.* "These thresholds are determined based on a company's tolerance for over-blocking and under-blocking." *Id.* Thus, an intermediary that is concerned about under-blocking content and the resulting risk of liability may set a lower confidence level for taking action on a particular type of content.

their health and safety. For example, strippers who post videos to TikTok have reported having "informational TikToks about sexual health, safety tips and general tutorials" targeted by removals or shadow bans.[29]

Sexual health information more generally is also at greater risk of removal, especially if it is aimed at minors. According to a 2020 report by UNESCO on digital sex education and young people, "sexuality education and information are increasingly being delivered through digital spaces, reaching millions."[30] Yet online sexual educators already face over-removal of their content.[31] For example, sex educators on Instagram report facing bans and account removals and that "posts that use flagged words, like 'sex' and 'clitoris,' have been removed from Instagram's search function."[32] An intermediary concerned about liability under the district court's interpretation of FOSTA may, for example, err on the side of

---

[29] Madeleine Connors, *StripTok: Where the Workers Are V.I.P.s*, N.Y. Times (July 29, 2021), https://nyti.ms/3HfXhgi.

[30] Susie Jolly et al., UNESCO, *A Review of the Evidence: Sexuality Education for Young People in Digital Spaces* 7 (2020), https://bit.ly/3OcGZXP.

[31] *See* Amber Madison, *When Social-Media Companies Censor Sex Education*, Atlantic (Mar. 4, 2015), https://bit.ly/3H9gvnH (reporting that Twitter, Facebook, and Google had rejected advertisements from various sexual health organizations as violating their policies prohibiting promotion of sexual or vulgar products or services).

[32] Abigail Moss, *'Such a Backwards Step': Instagram Is Now Censoring Sex Education Accounts*, Vice (Jan. 8, 2021), https://bit.ly/3aQ2L5e.

removing content from Planned Parenthood's Teen Council[33] or True Love Waits.[34]

As these examples show, the impact of the district court's interpretation of FOSTA will by no means be limited to intermediaries focused on sex work and sexual health. At the same time, even censorship on general-interest platforms will likely pose unique problems for sex and healthcare workers, as shown by this case and several other lawsuits in which plaintiffs are already seeking to impose liability on platforms merely for their day-to-day operations. *See, e.g., J.B. v. G6 Hospitality, LLC*, No. 4:19-cv-7848, 2020 WL 4901196, at *2, *8 (N.D. Cal. Aug 20, 2020) (alleging that craigslist should be liable under Section 1591, not because it had actual knowledge of sex trafficking on its site, but because it was aware "that its erotic services section was well known to commercial sex customers throughout the United States as a place to easily locate victims" and had been put "on notice of [general] human sex trafficking [content on its site] . . . from numerous sources"); *M.L. v. craigslist, Inc.*, No. 3:19-cv-6153, 2020 WL 6434845 (W.D. Wash. Apr. 17, 2020) (same); Compl. at ¶¶ 8, 56, *Doe v. The Rocket Sci. Grp. LLC*, No. 1:19-cv-5393 (N.D. Ga. Nov. 26, 2019) (alleging that MailChimp—a marketing

---

[33] *E.g.,* Planned Parenthood, *Teen Council*, https://bit.ly/3MDG5lN.

[34] *E.g.*, Lifeway, *Help Students Understand Sexual Purity*, https://bit.ly/3H9Nd8s.

platform—"made available its marketing resources and expertise" to a website that facilitated sex trafficking and so was "responsible for its natural consequences— the sex trafficking of Jane Doe"); *cf. Backpage.com LLC v. McKenna*, 881 F. Supp. 2d 1262, 1279 (W.D. Wash. 2012) (if the Internet Archive crawls an unlawful ad on another platform "and publishes it through its Wayback Machine, knowing that [the platform] has an 'adult services' ad section . . ., is [it] liable?").

> 2.   *The district court's interpretation of FOSTA creates a perverse incentive for online intermediaries to deliberately ignore the content posted on their services.*

Some intermediaries may react in a different, but just as detrimental, way if this Court does not reverse the ruling below, which held in part that constructive knowledge could be based merely on a platform's ability to monitor content depicting sex trafficking that appears on its service. An intermediary may well respond by making it difficult for users and others to inform it about alleged sex trafficking material or other objectionable content on its service. The intermediary may, for example, provide no public company contact information or other channels for users to report such content. Moreover, an intermediary may go so far as to not moderate content at all, so it can disclaim any alleged constructive knowledge of such content.

These results ultimately harm users and the public. Making it harder for users to report content depicting sex trafficking will mean that more of it remains

on an online service. Discouraging intermediaries from engaging in content moderation will also mean that a variety of content that intermediaries might otherwise choose to regulate—including what they deem disinformation, hate speech, harassment, and promotion of suicide and self-harm—will instead spread unchecked. This outcome is not what Congress intended when it enacted Section 230, or when it passed FOSTA amending it.

## CONCLUSION

For these reasons, amici respectfully urge this Court to reverse the district court's partial denial of Defendant-Appellant's motion to dismiss and to hold that FOSTA requires actual knowledge even for civil liability.

Dated: June 10, 2022

Respectfully submitted,

Jennifer Stisa Granick
*Counsel of Record*
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION
39 Drumm Street
San Francisco, CA 94111
(415) 343-0758
jgranick@aclu.org

Vera Eidelman
Laura Moraff
Joshua Block
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION
125 Broad Street

New York, NY 10004

Samir Jain
Emma Llansó*
Caitlin Vogus
CENTER FOR DEMOCRACY &
  TECHNOLOGY
1401 K St. NW, Suite 200
Washington, DC 20005
*Of counsel

Jacob A. Snow
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION OF NORTHERN
  CALIFORNIA
39 Drumm Street
San Francisco, CA 94111

Minouche Kandel
Zoe McKinney
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION OF SOUTHERN
  CALIFORNIA
1313 W. 8th Street
Los Angeles, CA  90017

*Attorneys for Amici Curiae*

**CERTIFICATE OF SERVICE FOR ELECTRONIC FILING**

I hereby certify that on June 10, 2022, I electronically filed the foregoing Amici Curiae Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the CM/ECF system, which effects service upon all counsel of record.


June 10, 2022                                    /s/ *Jennifer Stisa Granick*
                                                 Jennifer Stisa Granick
                                                 American Civil Liberties Union
                                                    Foundation
                                                 39 Drumm Street
                                                 San Francisco, CA 94111
                                                 (415) 343-0758
                                                 jgranick@aclu.org

                                                 *Counsel of Record for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief contains 5,285 words, excluding the items

exempted by Fed. R. App. P. 32(f), and complies with the length specifications set

forth by Fed. R. App. P. 29(a)(5). I further certify that this brief was prepared using

14-point Times New Roman font, in compliance with Fed. R. App. P. 32(a)(5) and

(6).

June 10, 2022                                  /s/ *Jennifer Stisa Granick*
                                               Jennifer Stisa Granick
                                               American Civil Liberties Union
                                                  Foundation
                                               39 Drumm Street
                                               San Francisco, CA 94111
                                               (415) 343-0758
                                               jgranick@aclu.org

                                               *Counsel of Record for Amici Curiae*